**Lioudmila KOSSOV and Pavel Kossov, Petitioners,**

**v.**

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 96–3910.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 24, 1997.

Decided Jan. 5, 1998.

Mary L. Sfasciotti (argued), Chicago, IL, for Petitioner.

Janet Reno, U.S. Atty., Office of the U.S. Atty. General, Washington, DC, Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Thomas P. Walsh, Office of the U.S. Atty. Civil Div., Chicago, IL, David M. McConnell, Kristal A. Marlow, Terri J. Lavi, James A. Hunolt, Dept. of Justice Civil Div., Immigration Litigation, Washington, DC, Tina Potuto (argued), Office of Immigration Litigation Civil Div., Washington, DC, for Respondent.

Before CUMMINGS, BAUER and ROVNER, Circuit Judges.

CUMMINGS, Circuit Judge.

Lioudmila Kossov and her husband, Pavel, came to the United States as visitors from the Soviet Union in 1991. Mrs. Kossov was born in the portion of the former Soviet Union that is now Russia and moved to what is now Latvia when she was seventeen. Mr. Kossov was born in what is now Latvia, of Russian parents, and lived there until the time the couple came to the United States.

The Kossovs held tourist visas that authorized them to stay in the United States for up to six months. During that period, Mrs. Kossov filed an application for asylum with the Chicago office of the Immigration and Naturalization Service (INS). After approximately two years, the INS denied the asylum application and instituted deportation proceedings against both of the Kossovs.

At a hearing on December 7, 1994, the Kossovs conceded deportability on the ground that they had overstayed the term of their tourist visas. They sought asylum and withholding of deportation, however, and denied the INS' claims that Mrs. Kossov was a native of Russia and a citizen of Latvia and that Mr. Kossov was a native and citizen of Latvia. Both of the Kossovs argued that they were in fact stateless because the Soviet Union, the country in which they had been born and from which they had departed for the United States, no longer existed. As a result, they each declined to designate a country of deportation, stating instead that they planned to base their arguments for asylum on facts relating to Latvia, which was the country in which they had last resided. The Immigration Judge (IJ) put off specifying a country of deportation until the hearing on the merits.

In January of 1995, Mrs. Kossov filed a new application for asylum, stating that she desired asylum from Latvia based on past persecution and a fear of future persecution there on account of her Pentecostal Christian religion and her Russian ethnicity. Mr. Kos-

sov was included in his wife's asylum application but did not file an application of his own.

On March 29, at the Kossovs' request, their attorney withdrew from the case. The IJ granted a continuance until April 20 to allow the Kossovs to obtain new counsel. When the hearing reconvened, however, the Kossovs had not yet located an attorney and therefore appeared *pro se*. The Kossovs indicated that they would prefer to conduct the hearing through a Russian interpreter, and so the judge continued the case until May 4. On that date, petitioners again appeared *pro se* (but with an interpreter present), and the judge conducted a hearing on the asylum application.

During the hearing, Mrs. Kossov declared that she was stateless, because the Soviet Union no longer existed. The INS disputed this claim and asked that the IJ designate Russia as Mrs. Kossov's country of deportation. The judge complied. Similarly, Mr. Kossov declared that he was stateless and declined to choose a country of deportation. At the request of the INS, the IJ designated Latvia as Mr. Kossov's country of deportation.

It appears from the IJ's oral decision that the bulk of the hearing concerned evidence of past persecution and fear of future persecution in Latvia, not in Russia. As noted previously, Mrs. Kossov's application for asylum had also been directed to Latvia, rather than Russia. Although the Kossovs were asked some questions concerning Russia, these seem almost to have been an afterthought. In addition, although a State Department country report on conditions in Latvia was part of the record at the hearing, no such report concerning Russia was introduced. At the conclusion of the hearing on May 4, 1995, the IJ denied the application for asylum but granted the Kossovs the privilege of voluntary departure from the United States in lieu of deportation. In the alternative, the judge ordered the Kossovs deported to Russia.

The Kossovs appealed the decision to the Board of Immigration Appeals (BIA), on the ground that they had proven their eligibility for asylum. They did not argue any error in the designation of their country of deporta-tion. The BIA affirmed the IJ's ruling. Although it characterized the order it was reviewing as denying asylum "and withholding of deportation to Russia and Latvia," the BIA's written opinion focused almost exclusively upon evidence concerning past and future persecution in Latvia, rather than in Russia. The BIA cited the State Department's report on Latvia, which stated that people in the Kossovs' position would likely be eligible for citizenship by the year 2003 and that Christians no longer suffered persecution in the post-Soviet Latvia. If the Kossovs refused voluntary departure, they were to be deported to Russia.

Following the BIA's decision, the Kossovs petitioned this Court for review. They argue that the IJ improperly failed to designate countries of deportation, that the order of deportation to Russia was unwarranted because the application and hearing were directed toward Latvia, and that they have sufficiently proven their case for asylum as to Latvia. Because we conclude that the IJ committed errors that severely prejudiced the Kossovs' ability to present their claim for asylum, we vacate the BIA's decision and remand for further proceedings.

## I. JURISDICTION OVER THE APPEAL

The INS argues that the Kossovs may not raise before this Court the issue of the IJ's designation of their country of deportation, because they did not specifically argue it before the BIA. This omission, the INS claims, constituted a failure to exhaust available administrative remedies and therefore deprives this Court of jurisdiction. According to the INS, only the propriety of the decision to deny asylum is properly before us.

We do not understand the Kossovs to argue that the IJ failed to designate a country of deportation at all. If they do make such an argument, it is patently wrong. At the outset of the hearing on the merits, the IJ explicitly designated Russia as the country of Mrs. Kossov's deportation and Latvia as the country of Mr. Kossov's deportation. The deeper question that the Kossovs most certainly do raise, however, is whether these

designations, and the subsequent order deporting both Mr. and Mrs. Kossov to Russia, allowed the couple an adequate opportunity to defend themselves against that deportation. If the INS' jurisdictional argument is correct, this Court may not reach that vital issue.

Title 8 of the United States Code, § 1105a(c) states, "An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted administrative remedies available to him as a matter of right under the immigration laws and regulations." This Court has further stated that the BIA "cannot be expected to resolve issues that the alien should have raised, but did not." *Perez–Rodriguez v. INS*, 3 F.3d 1074, 1080 (7th Cir.1993). Were it not for the peculiar circumstances presented here, these principles would operate to preclude our consideration of any issue not specifically raised before the BIA.

Here, however, the IJ and the BIA (and, not surprisingly, the Kossovs themselves) seem to have been confused about matters fundamental to the Kossovs' asylum claims. Mrs. Kossov's application for asylum was directed to Latvia, which was her country of last habitual residence. In substance, both the IJ's oral opinion and the BIA's written one appear to be concerned with the question of deportation to Latvia. Yet the order itself deports the Kossovs to Russia, not Latvia. The IJ never informed the Kossovs, who at the time were without counsel, that they had the right to seek asylum here and introduce evidence specifically directed against deportability to Russia. See 8 C.F.R. § 242.17(c)(2) (providing that immigration judge must advise alien of right to apply for asylum or withholding of deportation with respect to any country specified as a possible deportation site, provided alien "expresses fear of persecution or harm upon return to" such country); *In re Sagasti*, 13 I. & N. Dec. 771, 773, 1971 WL 24421 (BIA, 1971).

In short, nothing in the record indicates that the Kossovs ever had anything approaching a full opportunity to present evidence concerning their fears of persecution in Russia. What this Court is in effect asked to review is an order deporting the Kossovs to Russia in the absence of a fair hearing concerning that deportation. The BIA should have recognized sua sponte such a fundamental failure of due process during its consideration of the Kossovs' challenge to the deportation order. The Kossovs' failure to raise the designation issue before the BIA is therefore immaterial, and this Court has jurisdiction to consider the petition.

## II. THE MERITS OF THE PETITION

■ The foregoing discussion of the INS' jurisdictional objection has also pre–figured this Court's disposition of the merits of the Kossovs' petition. Had the IJ ordered the couple deported to Latvia, this Court might well have upheld the BIA's decision affirming that order. See *Gramatikov v. INS*, 128 F.3d 619 (7th Cir.1997) (rejecting asylum claim directed to former Soviet satellite country absent evidence to refute State Department report showing that anti-communists were no longer persecuted there). Mrs. Kossov testified before the IJ that she had once been beaten by the police in Latvia so severely that she suffered a miscarriage, and the judge found her testimony to be credible. Yet the IJ's conclusion favoring Latvia, affirmed by the BIA, would be entitled to deference from this Court; we would reverse it only if no reasonable finder of fact could have failed to find the Kossovs' fear of persecution well-founded. See *INS v. Elias–Zacarias*, 502 U.S. 478, 483–484, 112 S.Ct. 812, 816–817, 117 L.Ed.2d 38. So long as the order of deportation was "supported by reasonable, substantial, and probative evidence on the record considered as a whole," this Court would be bound to deny the Kossovs' petition for asylum. *Id.* at 481, 112 S.Ct. at 815.

But the order was not for deportation to Latvia; it was for deportation to Russia. The record contains precious little evidence relating to Russia at all, because both the hearing before the IJ and the BIA's review concentrated almost exclusively on Latvia. What little evidence there is concerning Russia is certainly not substantial enough to justify this Court in upholding the order of deportation. The INS' argument that the IJ's designation of Russia as Mrs. Kossov's

country of deportation at the outset of the single-day merits hearing put the Kossovs on notice that they might both be deported to Russia, and therefore that they ought to have presented whatever evidence they had concerning Russia immediately, fails miserably. The Kossovs appeared at the hearing without counsel. It is too much to expect that they should have the expertise to adapt instantaneously to such an unexpected turn of events, particularly given the IJ's failure, noted earlier, explicitly to inform them that they had the right to expand their application and their evidence to include opposition to deportability to Russia.

Just as the evidence does not justify upholding the order, however, it provides no grounds on which this Court could declare the order erroneous. Given the absence of evidence either supporting or undermining the order, the matter must return to the administrative process so that the Kossovs can receive a full and fair hearing for their claims of asylum and withholding of deportation as to Russia. The decision of the BIA is vacated, and the cause is remanded for further proceedings consistent with this opinion unless petitioners should now agree to voluntary departure to their country of choice.

ROVNER, Circuit Judge, concurring in the judgment.

I agree with my colleagues that the Kossovs are entitled to relief in this Court, but for a different reason. I believe the Immigration Judge's finding that the Kossovs did not suffer past persecution is not supported by substantial evidence. As the majority points out, the IJ found Lioudmila Kossov to be a credible witness. Incongruously, he found insufficient to establish past persecution her testimony that she was beaten by government agents until she miscarried her unborn child, while the agents taunted her about her religious beliefs. She also testified that she was threatened by police, detained, interrogated, fired from two jobs, had bank accounts mysteriously closed, and lost her business and her home, all on account of government disapproval of her Evangelical Christian beliefs. I believe this evidence, accepted as true by the IJ, was sufficient to demonstrate past persecution. *See Angou-*

*cheva v. INS*, 106 F.3d 781, 789–90 (7th Cir.1997). Having shown past persecution, the Kossovs are entitled to a rebuttable presumption in favor of granting asylum, which may be overcome by evidence suggesting that conditions in their home country have changed to such an extent that the Kossovs no longer are in danger of persecution there. *Id.*, 106 F.3d at 788.

The only evidence purporting to address present conditions in Latvia was a report from the State Department concluding that Evangelical Christians no longer face persecution in Latvia: "[Lioudmila's] description of the treatment of Evangelical Christians by the Soviet regime is generally consistent with country conditions for the 1970's and early 1980's. This is no longer the case in Latvia, a country with a Protestant religious tradition, where religious freedom prevails." Letter from United States Department of State, Office of Asylum Affairs, February 7, 1995, Record at p. 146. I doubt that the State Department's letter would overcome the presumption in the Kossovs' favor, however, because the beating that caused the miscarriage occurred in 1988, and much of the maltreatment that the Kossovs described occurred in the late 1980's and early 1990's, years after the State Department reported that Evangelical Christians were no longer at risk for such treatment in Latvia. This seriously calls into question the accuracy of the State Department report. Moreover, as the Lautenberg Amendment demonstrates, Congress itself disagrees with the State Department's assessment of the situation in Latvia. Although that Amendment does not directly apply to the Kossovs' case, the Amendment evidences Congress' belief that Evangelical Christians living in Latvia continue to be "targets of persecution." *See* 8 U.S.C. § 1157, as amended by Pub.L. 101167, Title V, § 599D, Nov. 21, 1989, 103 Stat. 1261, and subsequent enactments. I believe that on remand, the IJ should analyze the claim by granting the Kossovs the presumption in favor of asylum to which they are entitled, and by allowing the INS to present whatever evidence it has to rebut that presumption.