Sefadin ASANI, Petitioner,

v.

IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

No. 97–3556.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1998.

Decided Sept. 3, 1998.

As Modified Oct. 28, 1998.

Jay R. Hoffman (argued), Chicago, IL; Sefadin Asani, Carpentersville, IL, for Petitioner.

Michele Y.F. Sarko, Department of Justice, Office of Immigration Litigation, Washington, DC; Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL; Kristal A. Marlow, Alice E. Loughran (argued), Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before POSNER, Chief Judge, CUMMINGS and BAUER, Circuit Judges.

CUMMINGS, Circuit Judge.

Sefadin Asani is an ethnic Albanian native of the former Yugoslavia and a citizen of Macedonia. His wife and one son live in Macedonia, and he and his other son live in the United States.

In 1983, Asani participated in a political demonstration in Kosovo which supported Albanian rights and advocated the creation of an independent Albanian state. Asani was arrested at the demonstration. The police detained him in jail for two weeks where he was confined to a cell with only enough room to stand and handcuffed to a radiator on the wall. He was deprived of sufficient food and water, each day receiving only one slice of bread and one glass of water. Due to his confinement, he lost his construction job. After his release from jail, Asani came to the United States.

While in Chicago in 1983, Asani became a member of the Union of Kosovo, an Albanian rights organization, and participated in various demonstrations in support of Albanian rights all around the United States. He testified that he had attempted to apply for asylum here but was unable to do so because his attorney had passed away. In February 1987, Asani was deported from the United States to his hometown in the former Yugoslavia. Upon his return, he received a letter instructing him to come to the police station, where he was questioned about his political activities in the United States. He denied participating in any pro-Albanian demonstrations in the United States and knowing individuals on a list showed to him. After approximately four hours of questioning, the police released him.

A few days later, Asani was picked up by the police off of the street. The police again questioned him about his political activities in the United States. The police proceeded to beat him repeatedly with a police stick and their fists. The beating knocked out two of Asani's teeth and left marks on his cheek. He was released at the end of the day and fled to the United States.

On October 14, 1988, Asani entered the United States, where he has remained since that time. Asani once again joined the Union of Kosovo and participated in pro-Albanian demonstrations. As of 1996, the Macedonian authorities still were searching for him, sending letters and going to his home in Macedonia, and making threats against him and his son in the United States.

On December 5, 1994, the Immigration and Naturalization Service ("INS") began deportation proceedings against Asani. On March 18, 1996, an Immigration Judge ("IJ") denied Asani's application for asylum and withholding of deportation and issued an order that he be deported, affording him the privilege of voluntary departure and, in the alternative,

entering an order of deportation to the former Yugoslav Republic of Macedonia. On September 12, 1997, the Board of Immigration Appeals ("BIA") affirmed, and Asani petitioned this Court for review of the BIA's decision.[1]

## I. Asylum Issue

The first issue involves Asani's application for asylum. Asani applied for asylum under § 208(a) of the Immigration and Nationality Act ("Immigration Act" or "INA"), 8 U.S.C. § 1158(a), and withholding of deportation under § 243(h) of the INA, 8 U.S.C. § 1253(h), alleging past persecution and a fear of future persecution if he were to return to Macedonia. The IJ denied his application for asylum, and the BIA affirmed.

 Under § 208(a), an "alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of [8 U.S.C. § 1101(a)(42)(A)]." 8 U.S.C. § 1158; *Zalega v. INS*, 916 F.2d 1257, 1260 (7th Cir.1990). The Immigration Act defines "refugee" as

> any person who is outside any country of such person's nationality * * * and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). If an alien establishes past persecution, he or she is then entitled to a rebuttable presumption in favor of granting asylum. This presumption may be overcome by evidence indicating that the alien no longer is in danger of being persecuted again due to changed conditions in the home country. *Bereza*, 115 F.3d at 472 (quoting 8 C.F.R. § 208.13(b)(1)(I)); *Angoucheva v. INS*, 106 F.3d 781, 788 (7th Cir. 1997); *Skalak v. INS*, 944 F.2d 364, 365 (7th

Cir.1991). However, in some cases, even if there is little likelihood of future persecution, asylum may be granted as a matter of discretion for humanitarian reasons if the alien has suffered an "atrocious form[ ] of persecution" because "[e]ven though there may have been a change of regime in his country, this may not always produce a complete change in the attitude of the population, nor, in view of his past experiences, in the mind of the refugee." *Matter of Chen*, Int. Dec. 3104, at *16 (BIA 1989).

### A. Past Persecution

The BIA found that Asani had not established that he suffered past persecution as contemplated under § 101(a)(42)(A) of the Immigration Act. Specifically, the BIA commented that "[a]lthough the respondent testified that his teeth had been knocked out as a result of being beaten by the police during his last detainment, we do not find that the harm suffered by the respondent rises to the level of past persecution within the meaning of the Act." *In Re Asani*, A24 348 626, at 2 (BIA Sept. 12, 1997). With respect to the first arrest, the BIA continued that "although the conditions in the facility were deplorable, the record does not reflect that he suffered any physical or psychological harm." *Id.* As for his last two detentions, the BIA found that they did not constitute past persecution because they "consisted of only a few hours and [Asani] apparently did not suffer any serious injuries from the beating." *Id.*

 We review the BIA's interpretation of the Immigration Act *de novo* and its factual determinations under the "substantial evidence" standard. *Borca v. INS*, 77 F.3d 210, 214 (7th Cir.1996).

 The BIA found no past persecution, in part because it applied the wrong standard and in part because it seems that the BIA does not believe that knocking a person's

---

1. We have jurisdiction to review the BIA's decision under 8 U.S.C. § 1105(a). The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3009 (1996), signed into law on September 30, 1996, repealed this provision. However, because Asani was in deportation proceedings prior to the April 1, 1997 effective date of the Act, the IIRIRA does not apply to Asani's petition for review and § 1105(a) continues to be the appropriate standard of review. *Maliavkina v. INS*, 139 F.3d 901 (7th Cir.1998); *Bradvica v. INS*, 128 F.3d 1009, 1012 n. 1 (7th Cir.1997); *Bereza v. INS*, 115 F.3d 468, 470 n. 2 (7th Cir.1997).

teeth out is harm enough to constitute past persecution. Applying an incorrect standard, the BIA apparently believed that Asani was not subject to past persecution because he had not "suffered any physical or psychological harm" from his mistreatment by the Yugoslavian authorities and because he did not receive "serious injuries" when he was beaten by the police. However, this is not the standard recognized by this Court. While the Immigration Act does not provide a definition for the term "persecution," we have defined it as " 'punishment' or 'the infliction of harm' which is administered on account of * * * race, religion, nationality, group membership, or political opinion * * *." *Id.* "Although the conduct in question need not necessarily threaten the petitioner's 'life or freedom,' it must rise above the level of mere 'harassment' to constitute persecution." *Id.* (citing *Balazoski v. INS*, 932 F.2d 638, 642 (7th Cir.1991) (citations omitted)).

Accordingly, we remand in order for the BIA to apply the correct standard. However, we also are concerned that the BIA did not rationally consider the evidence of the harm Asani actually suffered due to his political activities. Even applying an incorrect and more demanding standard, the BIA found that the loss of two of Asani's teeth as a result of a police beating was not a "serious injur[y]" and that a two-week detainment in a cell with only enough room to stand, handcuffed to a radiator, and deprived of sufficient food and water because of Asani's participation in a pro-Albanian demonstration did not constitute "physical or psychological harm." We call into question the BIA's conclusion that the harm Asani suffered did not cause "serious injuries" or result in "physical or psychological harm." If having two teeth knocked out and being deprived of sufficient food and water are not "serious injuries" or "physical harm," what is?

However, because the BIA applied an incorrect standard, we remand for it to apply the proper one, noting that the appropriate standard—"punishment" or "infliction of harm" "that rise[s] above the level of mere 'harassment' "—is even less demanding than the standard used by the BIA and thus questioning whether the BIA's finding that Asani did not suffer past persecution is supported by substantial evidence. *Id.* On remand, we are confident that the BIA will consider the evidence fully and fairly under the correct standard.

We also note, as guidance on remand, that the two cases cited by the BIA in support of its conclusion that Asani did not suffer past persecution—*Zalega v. INS*, 916 F.2d 1257 (7th Cir.1990), and *Skalak v. INS*, 944 F.2d 364 (7th Cir.1991)—are distinguishable.

In *Zalega*, we held that actions by Polish authorities were not sufficient to demonstrate past persecution justifying granting of asylum where they arrested and interrogated Mr. Zalega on several occasions. 916 F.2d at 1260. Reasoning that "[f]or these detentions to be considered persecution, Zalega had to demonstrate that his detention involved more than simple incarceration," we found that because Zalega was detained for short periods of time and was not mistreated while incarcerated, it was reasonable for the BIA to hold that this was not substantial evidence of persecution. *Id.*

In *Skalak*, we likewise held that a Polish national had not suffered past persecution when she was jailed twice and interrogated for three days for her activities in the Solidarity movement and was harassed by officials at the school where she taught for her refusal to join the Communist Party, reasoning that the "brief detentions and mild harassment that [ ] Skalak experienced at the hands of the Polish authorities do not add up to 'persecution.' " 944 F.2d at 365. We also note that because we had already concluded that Skalak did not have a well-founded fear of future persecution, she had to demonstrate whether she should be "eligible for asylum, notwithstanding the absence of any danger of persecution, merely because she was persecuted in the past." *Id.* To be eligible for asylum based on past persecution alone, an alien must show "persecution so severe that perhaps a person should not be forced to return to the country in which she underwent it even if the danger of recurrence is negligible." *Id.* Thus, in addition to the fact that Skalak only suffered "brief detentions and mild harassment," she had a

much higher burden in order to rest her case exclusively on past persecution.

In contrast, Asani suffered more than the "brief detentions and mild harassment" suffered by *Skalak* and *Zalega*. He was detained in a jail cell with no room to sit, deprived of food and water, and repeatedly interrogated. He was also physically harmed by being subjected to a police beating where two of his teeth were knocked out. Furthermore, because Asani may be able to demonstrate a fear of future persecution, see discussion *infra* Part I.B, his situation is distinguishable from that of Skalak, who, in basing her asylum claim on past persecution alone, had to demonstrate more severe persecution than is required of an alien who relies on past persecution combined with a fear of future persecution to be granted asylum.

The BIA and the INS also rely on a case, *Matter of Chen*, Int. Dec. 3104 (BIA 1989), where the BIA found that the past persecution suffered by Mr. Chen was so severe that asylum should be granted on that basis alone. *Id.* at *21. The BIA held that where an asylum applicant has been subjected to especially severe persecution in the past, "humanitarian reasons" may warrant the granting of asylum "even if there is little likelihood of future persecution," *id.* at *19, reasoning that a petitioner who "has suffered under atrocious forms of persecution should not be expected to repatriate" even if conditions had changed substantially in his or her country of origin. *Id.* To establish such eligibility, an alien must show past persecution so severe that repatriation would be inhumane. *Baka v. INS*, 963 F.2d 1376, 1379 (10th Cir. 1992).

Mr. Chen, a Chinese Christian, was persecuted in China during the "Cultural Revolution." His father had been systematically tortured for eight years due to his religious beliefs, having been dragged through the streets in humiliation and badly burned during a Bible-burning crusade. Chen himself also had been tortured and harassed since the age of eight, having been locked in his house for six months, interrogated, physically abused resulting in permanent injuries, deprived of food and necessary medical atten-tion, and exiled to a rural village for "reeducation."

The INS argues that because Asani's situation is not as egregious as that of Mr. Chen, Asani has not suffered past persecution. Although we have not established a minimum showing of "atrocity" necessary to justify a discretionary grant of asylum based on past persecution, we concede that Asani's claims do not approach the level of atrocity suffered by the petitioner in *Chen*, and thus that the past persecution Asani experienced may not rise to the level of severity necessary to qualify for a "humanitarian" grant of asylum based on past persecution alone. *See Bereza*, 115 F.3d at 476 (noting the higher showing that must be made in the absence of a well-founded fear of future persecution).

However, Asani still may be statutorily eligible for asylum if he demonstrates a well-founded fear of future persecution if he is deported, which will be presumed based on a showing of past persecution. In such a case, the past persecution that must be proven does not need to rise to the level of *Chen*, where Chen's mistreatment merited a humanitarian grant of asylum based on past persecution alone. *See id.* at 475 ("[w]ithout a well-founded fear of persecution, [petitioner] must establish particularly heinous past persecution in order to show that he has compelling reasons for not returning to [his home country]"); *Bucur v. INS*, 109 F.3d 399, 406 (7th Cir.1997) ("a refugee who has no reasonable fear of future persecution must indeed prove that his past persecution was a severe rather than a mild * * * form of persecution"). In a case where the alien relies on past persecution plus a well-founded fear of future persecution, persecution is not defined as the "sustained, abusive treatment" involving "ferocious and sustained degradation" (Respondent's Br. at 31, 32) that Mr. Chen received, but rather as "punishment" or "the infliction of harm" administered on account of race, religion, nationality, group membership, or political opinion which need not necessarily threaten the petitioner's life or freedom, but which must rise above the level of mere harassment to constitute persecution. *Borca*, 77 F.3d at 214. Thus the *Chen* case is not the benchmark for what

constitutes past persecution in a situation where the alien also presents evidence of a well-founded fear of future persecution in order to receive asylum, but rather is an extreme case that far surpasses the threshold for past persecution as articulated by this Court in *Borca.*

We remand in order for the BIA to apply the correct standard. As previously noted, it is likely that the events described by Asani— being beaten resulting in the loss of two teeth, deprived of food and water, detained in a cell with no room to sit, and chained to a radiator—are sufficiently serious to rise beyond the level of mere harassment. Thus, while Asani may not be able to base his asylum claim solely on the treatment he received in the past, if he is able to demonstrate that he has a well-founded fear of future persecution, he may be granted asylum.[2]

### B. Well–Founded Fear of Future Persecution

In order to establish a well-founded fear of future persecution, an alien must not only show that his or her fear is genuine but must establish that a reasonable person in the alien's circumstances would fear persecution. *Id.* The BIA concluded that Asani did not present evidence that he had a well-founded fear of persecution if he were to return to Macedonia. However, because conditions in Macedonia have changed since the time of the BIA's decision, we order a limited remand, *see Caterpillar, Inc. v. NLRB,* 138 F.3d 1105, 1107–1108 (7th Cir.1998); *Mirchandani v. United States,* 836 F.2d 1223, 1224 (9th Cir.1988), to permit Asani to file a motion, pursuant to 8 C.F.R. § 3.2(c), to reopen the asylum issue based on changed circumstances in his home country.

Based on the record at the time, the BIA concluded that Asani had not demonstrated a well-founded fear of persecution if he were to return to Macedonia. The BIA relied on the Department of State's country profile dated April 1996, which noted that the Macedonians have been more tolerant and equitable in dealing with the Albanian minorities and that the Macedonian government has been careful to respect human rights and political freedom. However, the BIA also noted that the country profile stated that "[a]lthough[ ] there has been an increasing tension between the Macedonians and Albanian minorities, the government has attempted to diffuse this problem by maintaining a dialog with Albanian leaders" and by permitting Albanian studies to be taught at the university and Albanian language to be offered in elementary and high schools. *Asani,* at 3 (citing Bureau of Democracy, Human Rights, and Labor, Department of State, *Former Yugoslavia Profile of Asylum Claims and Country Conditions,* at 16 (April 1996)). Believing the situation in Macedonia to have changed dramatically since Asani left in 1988, the BIA observed that the communist regime has been replaced by a parliamentary democracy. Thus the BIA concluded that "we do not find that a reasonable person in respondent's circumstances[ ] would have a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* at 3.

Although Macedonia is no longer part of Yugoslavia and a new government has emerged there, Asani emphasized that in his hometown of Kicebo the local Macedonian authorities are the same persons who had held power under the Yugoslavian government. In addition, Asani testified that he believed that if he were to go back to Macedonia, he again would be persecuted for his

2. The INS argues that Asani waived the issue of fear of future persecution by not addressing the BIA's finding that no such fear existed in his petition. However, counsel for Asani explained that the error that the BIA made was finding no past persecution. Counsel indicated that the standard is that once past persecution is shown, then the issue is addressed of whether there is a well-founded fear of persecution because a finding of past persecution serves as the basis for a rebuttable presumption of fear of future persecu-

tion. Since it applied an incorrect standard, counsel reasoned that this case must be remanded in order to analyze whether Asani has shown past persecution. In any event, as the INS concedes, even if Asani does not challenge the BIA's decision regarding fear of future persecution based on the record at the time of the hearing, he can file a motion to reopen based on changed circumstances at any time if conditions have changed in his home country since the time of the hearing.

pro-Albanian activities, noting that as of 1996, the Macedonian authorities still were searching for him, going to his house in Macedonia and sending letters there requesting that he report to the police station in Macedonia, and making threats against him and his son in the United States.

While on the basis of the present record Asani may not have shown a substantial risk of future persecution, *see Gramatikov v. INS*, 128 F.3d 619 (7th Cir.1997), we need not decide this issue because conditions in Macedonia have changed since the time of the IJ's decision in 1996. See Chris Hedges, *Macedonia's Albanians Are Restive*, N.Y. Times, May 11, 1998, at A6 (emphasizing the deterioration of the position of the Albanian minority in Macedonia; stating that "[t]he nationalism that sowed the savage wars in Croatia and Bosnia and has set Kosovo alight is spilling with alarming speed into the civil life of this sleepy backwater * * *. Macedonia * * * has been unable to stanch the ideological mutations that lead to ethnic conflict," and noting that "[t]he Government has begun to crack down on the militants," sentencing the Mayor of Gostivar to seven years in prison for flying the Albanian flag in front of city hall and inciting separatism).

Since we do not have jurisdiction to consider matters outside the record, we order a limited remand to permit Asani to file a motion, pursuant to 8 C.F.R. § 3.2(c), to reopen the asylum issue before the BIA on the basis of newly discovered evidence of changed circumstances in his home country.[3] *See Demirovski v. INS*, 39 F.3d 177 (7th Cir.1994); *Feleke v. INS*, 118 F.3d 594, 599 (8th Cir.1997). "8 C.F.R. § 3.2 provides that an asylum applicant may petition the Board to reopen her case to present new evidence between the time the BIA renders a decision and the time she is directed to depart the United States. * * * [W]here the motion to reopen presents evidence sufficient to call into question the Board's decision, the Board would then reopen the asylum proceeding to allow for a more extensive inquiry into the disputed facts." *Kaczmarczyk v. INS*, 933 F.2d 588, 597 (7th Cir.1991). Such a mechanism is necessary because "[w]e continue to

be distressed that 'asylum cases move so sluggishly through the administrative and judicial process that by the time they reach us, the relevant political circumstances may have significantly changed.'" *Sivaainkaran v. INS*, 972 F.2d 161, 166 (7th Cir.1992) (citing *Balazoski*, 932 F.2d at 643) (where this Court was concerned that the BIA's decision was based on stale information regarding the current state of affairs in Sri Lanka, we stressed that petitioner could bring new evidence of changed circumstances to the attention of the Board by filing a motion to reopen under 8 C.F.R. § 3.2); *see also Borca*, 77 F.3d at 217 (where we reversed the BIA's conclusion that Asani failed to meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42)(A) and remanded, anticipating "that the BIA will wish to revisit the subject of the current conditions in Romania, in light of the time that has elapsed and the evolving nature of the Romanian political scene").

Thus we order a limited remand to enable Asani to file a motion to reopen with the BIA. If he does so, we are confident that the Board will give that evidence full and fair consideration. In the event that on remand Asani does not receive relief, this panel retains jurisdiction, and his petition for review in this Court will be reactivated.

## C. Conclusion on Asylum Issue

Based on the foregoing, we remand for the BIA to apply the proper standard for past persecution and to reconsider the evidence presented in light of that standard, noting that the cases relied upon by the BIA are distinguishable from Asani's situation and emphasizing that *Chen* is not the benchmark for past persecution in a situation where an alien relies on past persecution plus a well-founded fear of future persecution in his or her application for asylum. We also order a limited remand to permit Asani to file a motion to reopen the asylum issue based on changed circumstances. Thus we vacate the BIA's conclusion that Asani has failed to meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42)(A) and remand this part

---

**3.** The INS, in fact, suggested at the oral argument that Asani could do this.

for further proceedings in conformity with this opinion.

## II. Suspension of Deportation Issue

■ The second issue in this case is the failure of the Immigration Judge *sua sponte* to inform Asani of his right to apply for the benefit of suspension of deportation.

For Asani to have been able to establish eligibility for suspension of deportation at the time of his deportation hearing, Asani had to meet the requirements of § 244(a) of the INA.[4] Specifically, he had to demonstrate that: (1) he has been physically present in the United States for at least seven continuous years; (2) he has been a person of good moral character during that time; and (3) he would suffer extreme hardship if deported. 8 U.S.C. § 1254(a)(1) (1996) (repealed); *Urban,* 123 F.3d at 648.

Under 8 C.F.R. § 242.17(a), the IJ *sua sponte* has the duty to advise an apparently eligible deportee of the right to seek suspension of deportation. Specifically, § 242.17(a) requires that "[t]he immigration judge shall inform the respondent of his or her apparent eligibility to apply for any of the benefits enumerated in this paragraph [which includes suspension of deportation under § 244(a) ] and shall afford the respondent an opportunity to make application therefor during the hearing." Because an alien or his or her attorney might be unaware of certain available benefits under the complicated immigration laws, the rule giving the IJ the duty of informing the deportee of the right to seek suspension of deportation is intended to protect the alien against the risk of error by his or her lawyer.

At the time of the deportation hearing, Asani had resided in the United States continuously for over seven years (from October 14, 1988 until March 18, 1996) and thus appeared to have been eligible for the benefit of suspension of deportation. Asani also had been found to be a person of good moral character by the BIA when determining his entitlement to another type of statutory relief. Under § 242.17(a), the IJ had a duty to inform Asani of his apparent eligibility for suspension of deportation and allow him to present evidence demonstrating that he would suffer extreme hardship if deported. The IJ failed to notify Asani of this right. As a result, Asani did not apply for suspension of deportation at the hearing.

■ Because of the rule requiring that the IJ inform Asani of his right to seek suspension of deportation, the failure of Asani's lawyer to object at the deportation hearing was not a waiver of Asani's right to apply for suspension of deportation. However, the situation becomes more complicated because Asani did not raise the issue before the BIA, so that the BIA was not able to correct the IJ's error. The majority of the BIA did not address the IJ's error and affirmed the order of deportation. However, the dissenting board member recognized the IJ's failure to inform Asani of his right of suspension of deportation and found that such error rendered the proceeding below unlawful.

We need not reach the question of whether Asani's failure to raise the IJ's error before the BIA may have prevented us, by virtue of the doctrine of exhaustion of administrative remedies, from considering the issue because INS counsel represented at the oral argument that an untimely filing of a motion to reopen based on the IJ's error may be permissible under new regulations. Specifically, INS counsel explained that Asani had two opportunities to raise the regulatory issue before the BIA. First, he could have raised it on direct appeal from the IJ's decision, which Asani predictably did not do based on the

---

4. As previously noted, on September 30, 1996, Congress passed the IIRIRA, *Urban v. INS,* 123 F.3d 644, 646 n. 1 (7th Cir.1997), which repealed § 244 of the INA and enacted a new suspension of deportation provision. See INA § 240A, 8 U.S.C. § 1229b. Specifically, the IIRIRA, which became effective on April 1, 1997, provides for a new, more limited remedy entitled "cancellation of removal" that replaces suspension of deportation relief previously available under § 244(a). See IIRIRA sec.sec. 304, 308(b)(7). "The new § 240A(b)(1) requires a period of 10, rather than 7, years continuous physical presence in order for nonpermanent resident aliens to be eligible for 'cancellation of removal' * * * [and] provides that 'the period of continuous physical presence in the United States shall be deemed to end when the alien is served a notice to appear.'" *Astrero v. INS,* 104 F.3d 264, 266 (9th Cir.1996); see 8 U.S.C. §§ 1229b(b)(1)(A), 1229b(d)(1).

fact that he failed to raise it before the IJ and was seemingly unaware of this benefit. Second, Asani could have moved to reopen the deportation proceedings to apply for discretionary suspension of deportation after the dissenting board member of the BIA identified the issue *sua sponte*. Under the regulations, an alien can move to reopen to apply for discretionary relief if such relief was not fully explained and if he was not afforded an opportunity to apply. See 8 C.F.R. § 3.2(c)(1). Because Asani did not make a motion to reopen within the time frame set by regulation, *see* 8 C.F.R. § 3.2(c), INS counsel noted that a motion to reopen filed now would be untimely. However, INS counsel then suggested that "even though his motion to reopen on the suspension issue is now untimely, that untimeliness may be excused so that the agency can fully effectuate the recent legislation enacted by Congress [specifically, the Nicaraguan Adjustment and Central American Relief Act (NACARA) ]." [5]

Based on this representation at the oral argument by INS counsel that an untimely filing of a motion to reopen the suspension of deportation issue due to the IJ's error may be permissible under new regulations, we order a limited remand to enable Asani to file such a motion and retain jurisdiction of the appeal pending that limited remand. *See Caterpillar*, 138 F.3d at 1107–1108; *Mirchandani*, 836 F.2d at 1224. In the event that the INS, contrary to its representation, does not permit Asani's filing of a motion to reopen the suspension of deportation issue, since this panel retains jurisdiction, Asani's petition for review in this Court will be reactivated in order for us to address the procedural issue of the exhaustion of administrative remedies, unless the issue is mooted by the BIA's granting asylum on the basis of newly discovered evidence of changed circumstances in the home country.

■ As a brief comment on the procedural issue of whether Asani's failure to raise the IJ's error before the BIA precludes appellate jurisdiction, we note this Court's recently issued opinion of *Kossov v. INS*, 132 F.3d 405 (7th Cir.1998), which involved a situation where the alleged failure to exhaust administrative remedies did not preclude appellate jurisdiction, and the Ninth Circuit's decision in *Duran v. INS*, 756 F.2d 1338 (9th Cir.1985), which involved facts similar to the instant case.

In *Kossov*, the IJ denied the Kossovs' application for asylum but granted them the privilege of voluntary departure in lieu of deportation, and, in the alternative, ordered them deported to Russia. The Kossovs appealed the decision to the BIA on the asylum issue but did not argue any error in the designation of their country of deportation. 132 F.3d at 407. The BIA affirmed the IJ's decision, and the Kossovs appealed to the Seventh Circuit, arguing, *inter alia*, that the order of deportation to Russia was not justified because the deportation hearing focused on evidence regarding deportation to Latvia and that the IJ violated his duty to advise them of their right to introduce evidence specifically directed against deportability to Russia according to 8 C.F.R. § 242.17(c)(2). *Id.* at 407, 408. The INS argued that the Kossovs were not entitled to raise the issue of the IJ's designation of their country of deportation on appeal to the Seventh Circuit because they did not raise it before the BIA, claiming that this failure to exhaust available administrative remedies deprived the Seventh Circuit of jurisdiction. *Id.* at 407.

Recognizing the IJ's violation of his duty to advise the Kossovs of their right to apply for withholding of deportation with respect to any country specified as a possible deportation site and to give them a full opportunity to present evidence concerning their fears of persecution in Russia, we held that the Kossovs' failure to raise their claim before the BIA did not deprive this Court of jurisdiction because the BIA should have recognized *sua sponte* such a fundamental failure of due process. *Id.* at 408. Concluding that the Kossovs' failure to raise the designation issue before the BIA was immaterial, we held that we had jurisdiction to consider the petition. *Id.*

Based on INS counsel's representation that Asani may be able to file an untimely motion to reopen the suspension of deporta-

---

**5.** Counsel also indicated that the BIA always has the discretion to take the issue on certiorari. *See* 8 C.F.R. § 3.1(c).

tion issue under new regulations, we do not now need to analyze whether failure to advise a deportee about his eligibility for suspension of deportation is a fundamental failure of due process that should be raised *sua sponte* by the BIA like the error of failing to advise a deportee of the right to present evidence regarding a designated country of deportation. However, we note that in the event of a fundamental failure of due process, we do not look at the INS' exhaustion argument with favor and will not conclude that failure to raise the issue before the BIA deprives this Court of jurisdiction.

Similarly, we note the Ninth Circuit's opinion in *Duran*, which involved the same legal issue as in Asani's case. In that case, the IJ failed to inform Mrs. Duran of her right to apply for suspension of deportation under § 244 of the INA, 8 U.S.C. § 1254(a)(1), even though he had a duty to do so. 756 F.2d at 1341. Instead of appealing to the BIA, Mrs. Duran filed a motion to reopen the deportation proceedings on the ground that she had not been advised of her eligibility for suspension of deportation. *Id.* at 1339. The IJ denied her motion to reopen because she had not provided new evidence, and the BIA affirmed. *Id.* In vacating the BIA's decision, the Ninth Circuit found it insignificant that she did not appeal to the BIA and that she technically did not have "new evidence" in support of her motion to reopen. The court reasoned that the IJ failed to carry out the responsibility of informing her of her right to apply for relief when the record indicated that she had been in the United States continuously for seven years and thus might be eligible for suspension of deportation. *Id.* at 1341. This error by the IJ disadvantaged Mrs. Duran because she may have been able to prove extreme hardship and thus qualify for suspension of deportation, but now, due to the IJ's error, she was required to present new evidence in order reopen her case. *Id.* The court stressed:

> We do not look with favor upon INS violation of its own regulations. *Mendez v. INS*, 563 F.2d 956, 959 (9th Cir.1977). Had the INS notified [Mrs. Duran] as required, she may have been able to demonstrate extreme hardship. The INS must

be held to the highest standards in the performance of its duties.

*Id.* at 1342.

Thus the court vacated the decision denying her motion to reopen and remanded the case with instructions to restore Mrs. Duran to such status as would enable her to apply for suspension of deportation as if she were an alien who received proper notice at the deportation hearing. *Id.*

As emphasized by the Ninth Circuit in *Duran*, we too do not look with favor upon the INS' reluctance to follow its own regulations and express our displeasure at its handling of this case. *See also Mendez*, 563 F.2d at 959 ("[c]ourts have looked with disfavor upon actions taken by federal agencies which have violated their own regulations"). Under INS' regulations, the IJ has an absolute duty to inform a deportee of his apparent eligibility to apply for the benefit of suspension of deportation. The IJ's failure to inform Asani of his right to apply for suspension of deportation is most unfortunate because had Asani been notified of this right, he may have been able to demonstrate extreme hardship and have been granted suspension of deportation and thus could have avoided the more protracted route available to him now.

## III. Conclusion

We remand for the limited purpose of permitting Asani to file a motion (1) to reopen the asylum issue based on changed circumstances in his home country and (2) to reopen the suspension of deportation issue based on INS counsel's suggestion at the oral argument that an untimely filing due to the IJ's error may be permissible under new regulations. We also remand in order for the BIA to apply the proper standard for past persecution.

Because we order only a limited remand, this panel will retain jurisdiction. In the event that on remand Asani receives no relief, his petition for review in this Court will be reactivated. We request that counsel for both parties file a status report with this

Court within 14 days after the BIA addresses these issues.